John B. **CHESTER** et al., Appellants,

v.

Robert A. **JONES**, Appellee.

No. 98.

Court of Civil Appeals of Texas.

Tyler.

Jan. 21, 1965.

Rehearing Denied Feb. 11, 1965.

Charles S. Chester, Shank, Irwin & Chester, Lloyd Elliott, Brundidge, Fountain, Elliott & Churchill, Dallas, for appellants.

William P. Fonville, Goldberg, Fonville, Gump, Strauss & Hauer, Dallas, for appellee.

DUNAGAN, Chief Justice.

This is a suit by Dr. Robert A. Jones for an accounting of benefits under the terms of a written contract by which he was associated with appellants in the practice of medicine in Lancaster, Texas. The trial court, without the aid of a jury, rendered judgment for Dr. Jones in the amount of $38,536.37. Appellants have appealed, complaining that the judgment for appellee was erroneous because the trial court incorrectly calculated the amount owed Dr. Jones in the accounting under the terms of the contract.

On February 15, 1952, Dr. John B. Chester and six other medical doctors, by written agreement, associated themselves for the general practice of medicine, surgery and allied arts under the firm name of The Chester Clinic. Thereafter, in June, 1952, appellee, Dr. Robert A. Jones, was employed by the clinic and in September, 1952, was admitted as a member of the association. During the time Dr. Jones was associated with appellants, he practiced in the Lancaster, Texas, branch of the clinic. The association of Dr. Jones with the clinic did not prove satisfactory to the other associates and on June 30, 1960, the association of Dr. Jones was terminated by the other associates in full compliance with the terms of the contract.

The contract contained a provision relating to the rights and duties of the respective parties during the time they were associated. It provided that Dr. John B. Chester should continue to own all the properties of the clinic, including accounts receivable, subject to the other provisions of the agreement, and rights in such properties should not vest in other parties to the contract. The contract also contained provisions relating to the rights and duties of the parties thereto in the event of the termination of the association of a member. It provided generally that in the event of the termination of the association of any party by death, disability or retirement, the terminating party or his heirs should receive certain specified benefits. This contract has been construed by the Austin Court of Civil Appeals in Jones v. Chester, 363 S.W.2d 150, error refused, n. r. e.

Dr. Jones filed a suit against appellants in June, 1961, for damages in the amount of $400,000.00 for wrongful discharge and for an accounting of benefits under the contract.

The trial court granted a summary judgment for appellants and Dr. Jones appealed. The Court of Civil Appeals in Jones v. Chester, supra, reversed and remanded the case holding that the discharge of Dr. Jones was made in full accordance with the terms of the contract, was not a wrongful discharge and Dr. Jones was therefore entitled to no damages.

By Point One appellants complain of the trial court's judgment in awarding appellee $19,510.17 for his proportionate share of the total of the clinic's accounts receivable. The contention is made that under the undisputed evidence the maximum which could be awarded under the contract is $9,403.40. The relevant portions of the contract relating to "accounts receivable" is found in Paragraph 11 as follows:

"In event of the death of any party hereto, or in event he shall become permanently disabled or permanently retire from the practice of his profession, in addition to the benefits set out in Paragraphs 6, 8, 9 and 10, above, such party, his heirs, executors, or assigns shall be entitled to a proportionate share of the total of all accounts receivable then carried on the books of THE CHESTER CLINIC which have not been outstanding for more than three years immediately preceding such death, disability or retirement. The amount which any party shall be entitled to under this provision shall be the proportion which his average percentage of participation in net profits for the three year period of his service to THE CHESTER CLINIC immediately preceding his death, disability, or retirement bears to the total of such accounts receivable; provided that no party shall participate in the accounts receivable under this provision until

he has completed three years of service to THE CHESTER CLINIC. It being agreed and understood that the sum to which Dr. Chester shall be entitled under this provision shall be 30% of said accounts receivable."

Paragraph 12 of the contract reads as follows:

"Any and all amounts to which any party may be entitled under this agreement by virtue of his death, permanent retirement, or disability shall be computed and totalled as of the date of such death, permanent retirement, or disability and shall be payable to him, his heirs, executors, administrators, or assigns, in equal monthly installments of $500.00 each, beginning on or before the 15th day of the month succeeding such death, resignation, retirement, or disability, and continuing on the 15th day of each succeeding month thereafter until the entire sum shall be paid. All payments shall be payable from gross income of THE CHESTER CLINIC."

The undisputed evidence shows that appellee was discharged on June 30, 1960, at which time the accounts receivable due and owing to the clinic within the three year period mentioned in Paragraph 11 amounted to $175,293.49. The total amount of cash ultimately collected from such accounts receivable, however, was $84,487.90. The remainder of such accounts is admittedly uncollectible and worthless. It was stipulated by the parties that the average percentage of participation of appellee in the net profits of the clinic for such three year period was .1113. Thus, the trial court's award in this regard represents .1113 of $175,293.49, amounting to $19,510.-17. Appellants assert that the proper amount to be allocated to appellee is .1113 of $84,487.90, the amount of the accounts receivable actually collected, amounting to $9,403.40. Therefore, it is apparent that the basic difference between the parties on this point is whether the amount to which

appellee is entitled is to be calculated on the cash basis of the total amount of the accounts receivable, regardless of collectibility, or whether his percentage of the accounts receivable is to be calculated on the accounts which had in fact been collected at the time of suit. The trial court construed Paragraph 11 so as to award appellee the larger sum. As we construe Paragraph 11 of the contract, it provides that a disassociated member in addition to the benefits provided in other sections of the contract, is entitled to a percentage of the "accounts receivable" then carried on the books of the clinic which accounts had not been outstanding more than three years. No provision is made in Paragraph 11 for the payment thereof in cash. The paragraph merely awards the member a share of "accounts receivable" and provides a yardstick to determine the amount of "accounts receivable" to which the member is entitled. It is settled that "accounts receivable" are contractional obligations owing to a person on an open account. Valley Nat. Bank of Phoenix v. Shumway, 63 Ariz. 490, 163 P.2d 676, Supreme Court of Arizona; West Virginia Pulp & Paper Co. v. Karnes, 137 Va. 714, 120 S.E. 321, Supreme Court of Appeals of Virginia. Although no provision is made in the contract for the reduction of this benefit to a present cash value—yet the trial court's construction of the paragraph, in effect, converts the accounts receivable to cash. The language used in the paragraph is not equivalent to "an amount of cash equal to the total of all accounts receivable." The benefit conferred is just what it says—a proportionate share of "accounts receivable." An "accounts receivable" acquires a cash value only to the extent of its collection. Paragraph 11 makes no attempt to define or state what the "cash amount" of the member's proportionate share will be. It occurs to us that the *value* of such proportionate share of the accounts receivable must be determined by reference to the total amount of cash ultimately collected from the accounts. As stated in Huey &

Philp Hardware Co. v. Shepperd, 151 Tex. 462, 251 S.W.2d 515, (1952), "The cash value of accounts and notes receivable is the amount which may be realized in cash from the sale or collection thereof."

We are of the opinion, therefore, that the judgment of the trial court awards appellee a benefit not justified by the clear express provisions of Paragraph 11.

Appellee argues in support of the trial court's judgment that Paragraph 11 does not limit the disassociated member to a proportionate share of only such accounts receivable as shall thereafter be collected. This is true; but the contract does not say that the proportionate share of the "accounts receivable" shall be paid immediately in cash. Appellee says that he is entitled to benefits under the contract computed in terms of dollars, and that the language of Paragraph 11 merely provides the formula for the ascertainment of the amount of dollars payable. To apply such a construction to Paragraph 11 would indeed be adding a benefit to appellee thereunder and, in effect, rewriting Paragraph 11 for the parties. The provisions of Paragraph 11 do not provide a formula for the ascertainment of the amount of dollars then due appellee, but constitute a description of the benefit conferred therein. The contract conferred upon the disassociated member a benefit consisting of a proportionate share of "accounts receivable"—not dollars. If the total of the accounts receivable is in fact collected, then appellee would have been entitled to the amount awarded by the trial court. We cannot say, however, that the dollar value of an "account receivable" can be ascertained until it has been determined whether the account receivable is collectible. If the parties to the contract had intended that the share of "accounts receivable" awarded to appellee under Paragraph 11 be converted to cash, or cash value at the time of the disassociation, they could have simply so provided therein. The language used does not justify the award to

appellee of the "money value" of such accounts receivable.

Appellee further argues that if the determination of the amount due appellee must await a determination of the collectibility of the accounts receivable, the same is inconsistent with the provisions of Paragraph 12 of the contract whereunder it is provided that the amount of appellee's benefits are to be totaled and computed as of June 30, 1960. Paragraph 12 of the contract does provide that any and all amounts to which a disassociating party may be entitled thereunder shall be computed and totaled as of the date of the disassociation. This is not inconsistent with the formula set forth in Paragraph 11 which determines the amount of "accounts receivable" to which appellee is entitled. The amount of the latter is definitely computed and totaled as of the date of disassociation, but that does not mean, in the absence of express provision therefor, that the same should be immediately converted and paid to appellee in cash. Moreover, the fact that Paragraph 12 provides for payment of any and all amounts to which the disassociating member is entitled in equal monthly installments of $500.00 each, beginning on or before the 15th day of the month following such disassociation does not have the effect of enlarging the benefits provided in Paragraph 11 from "accounts receivable" to cash.

■ A cardinal rule of construction is that agreements must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. When the contract itself is not plain and unmistakable, but is open to more than one meaning, the probability that men in the circumstances of the parties would enter into one agreement as opposed to another are competent for consideration on the question as to what the agreement was which the written contract established. Portland Gasoline Company v. Superior Marketing Company, 150 Tex.

533, 243 S.W.2d 823, (1951). These parties, being educated men of business experience, must be held to have known that an "account receivable" is nothing more than a debt owing and that in the business world many "accounts receivable" prove to be, for various reasons, uncollectible and worthless. It does not comport with reason to conclude that the parties by Paragraph 11 intended to award a disassociated member a cash sum equal to his share of "accounts receivable," the value of which could not be known until efforts to collect them had been exhausted. The more reasonable interpretation, it seems to us, is that the member received his share of the "accounts receivable" if and when collected.

We conclude that the trial court erroneously construed Paragraph 11 in the particulars noted and that under the undisputed and admitted facts herein, the maximum amount to which appellee was entitled thereunder was $9,403.40. Appellants' point is sustained.

■ The appellants next contend by Point Two that the trial court erred in awarding to Dr. Jones $6,694.13 in lieu of unused vacation time, because the contract does not contain any provision entitling a disassociated member to a cash payment in lieu of such unused vacation time. This contention is sustained.

At the time Dr. Jones was discharged on June 30, 1960, he had accumulated two months' vacation time pursuant to Paragraph 8 of the contract which reads as follows:

"Each party hereto, except as hereinafter provided, shall be entitled to an annual vacation of two (2) weeks duration upon completion of one year's service to THE CHESTER CLINIC: upon completion of three (3) year's (sic) service to said Clinic, each party shall be entitled to three (3) weeks annual vacation; and upon completion of six (6) years service to said Clinic and thereafter, each party shall be en-

titled to one month annual vacation. Such annual vacation time may be accumulated to a maximum of two months, provided that not more than one month annual vacation may be taken continuously without the concurrence of a majority of the other parties hereto."

The trial court awarded Dr. Jones the cash payment of $6,694.13 in lieu of the two months' vacation which Dr. Jones had not used at the time of his discharge. The trial court arrived at said sum by multiplying Dr. Jones's percentage participation in the net profits of the clinic at the time of his discharge times the net profits of the clinic for the two months immediately after his discharge. The effect of the court's action therefore gave Dr. Jones two months' vacation with full pay after the date of his discharge. The appellants argue that the trial court was in error and that the contract does not provide that a disassociated member is entitled to pay in lieu of unused vacation at the time of his termination.

It is our considered opinion that Dr. Jones is not entitled to the award of $6,694.13 given him by the trial court in lieu of unused vacation time because Paragraph 8 of the contract does not provide a cash benefit in lieu of the unused vacation time. Moreover, even if it could be said appellee was entitled to a cash payment in lieu of his unused accumulated vacation time under the express provisions of Paragraph 8, without the concurrence of the majority of the appellants, he could not get more than one month. In the absence of express contractual authorization, the appellee is not entitled to a cash payment in lieu of unused vacation time accumulated under the provisions of Paragraph 8.

Dr. Jones was not an hourly-paid employee and there was no limitation on the number of hours required to be devoted to his professional duties at the clinic. In Lim v. Motor Supply, Ltd., 45 Haw. 111, 364 P.2d 38 (1961) the Supreme Court of Hawaii had the identical question before

it and held that a discharged employee who was not working for an hourly wage and not working under collective bargaining agreement was not entitled to pay in lieu of unused vacation at the time of his termination. The court held as follows:

"There is an obvious distinction between a privilege to accumulate vacation time from year to year, and a right to be paid for the accumulated vacation if not enjoyed. If the first is permitted the situation will take care of itself; an employee who permits too much vacation time to accumulate will not be able to take it, and this will provide a practical limit on the accumulation of vacation time. On the other hand, if there is a right to draw vacation leave in pay, then the emphasis shifts from a right to a vacation, a 'beneficent surcease from regular duty' (Nicholson v. Amar, 7 Cal. App.2d 290, 45 P.2d 697; Nolan v. State, Ct.Cl., 44 N.Y.S.2d 328; In re Dauber, 151 Pa.Super. 293, 30 A.2d 214; Butler v. United States, 101 Ct. Cl. 641) to a right to pay in lieu of vacation, something quite different, as the cited cases hold; see also Simson v. City of New York, Sup.App.T., 151 N.Y.S.2d 218.

"The cases cited by plaintiff-appellee upholding the right to vacation pay are with one exception cases of collective bargaining agreements under which it has been held that: 'A vacation with pay is in effect additional wages.' In re Wil-low Cafeterias, Inc., 2 Cir., 111 F.2d 429, 432, followed in In re Public Ledger, Inc., 3 Cir., 161 F.2d 762; Textile Workers Union of America v. Paris Fabric Mills, 18 N.J.Super. 421, 87 A.2d 458, affirmed 22 N.J.Super. 381, 92 A.2d 40; Pattenge v. Wagner Iron Works, 275 Wis. 495, 82 N.W.2d 172; Tynan v. KSTP, Inc., 247 Minn. 168, 77 N.W.2d 200; Division of Labor Law Enforcement v. Ryan Aeronautical Co., 106 Cal.App.2d Supp. 833, 236 P.2d 236, annotated 30 A.L.R.2d

351. Plaintiff-appellee further relies on National Manufacturers and Stores Corp. v. Slatton, 22 Labor Cases #67,-259 (1952), in which Wil-low Cafeterias was followed by the Tennessee Court of Appeals, but this only supports the right to current vacation, which is not in issue.

"We agree with defendant-appellant that if a right to draw vacation leave in pay exists, it basically is a right to be paid for overtime. That is, an employee having worked when he could have had vacation time, this constitutes overtime. So, in the present case, plaintiff not having insisted upon his annual vacation, and not having made an issue as to the opportunity to take it, was in the same position as any employee who finds that the proper discharge of the duties of his employment entails overtime.

"However, an employee on a monthly or weekly salary cannot collect for overtime work which is of the same nature as the work contracted for, in the absence of express agreement or uniform custom. A limitation on the number of hours required to be devoted to the work is not a basic part of the agreement in such case. Sharpe v. Arabian American Oil Co., 111 Cal. App.2d 99, 244 P.2d 83; Robinette v. Hubbard Coal Mining Co., 88 W.Va. 514, 107 S.E. 285, 25 A.L.R. 212; Wheatley v. Carl M. Halvorson, Inc., 213 Or. 228, 250, 323 P.2d 49, 59; Annotations, 25 A.L.R. 218, 107 A.L.R. 705; 35 Am.Jur., Master and Servant, § 66; 56 C.J.S. Master and Servant § 97 b; see also Sheets v. Eales, 135 Kan. 627, 11 P.2d 1020. The parties are agreed that plaintiff in this case was not under the protection of any wage and hour law, and the above principle is applicable. We deem the collective bargaining agreement cases inapplicable."

Dr. Jones could have taken his vacation at his leisure during the time he was associated with the clinic, but he did not choose to do so. If the parties to the contract had intended that a discharged associate should be paid cash in lieu of unused vacation at the time of his discharge, they could very easily have so provided, but no such provision was incorporated in the contract.

Appellee cites the case In re Wil-low Cafeterias, Inc., 111 F.2d 429, 2 Cir., 1940 as an authority on this point. The In re Wil-low case was distinguished by the Supreme Court of Hawaii in the Lim case. It involved a claim and a bankruptcy proceeding by wrongfully discharging an employee who had been employed under a union collective bargaining agreement. Dr. Jones was not working under a collective bargaining agreement nor was he discharged wrongfully or unjustifiably, but rather was discharged "in accordance with the terms of the contract."

Furthermore, assuming that appellee was entitled to a cash payment in lieu of his two months' vacation time (and we do not so hold) the contract does not provide a formula or method by which it could be determined the amount of cash he would be entitled to receive.

By Point Five appellants complain of the judgment rendered in a lumped sum in the amount of $38,536.37 asserting that the contract provides that the benefits to which appellee may be entitled to thereunder should be paid at the rate of $500.00 per month as provided in Paragraph 12. While there might be merit in appellants' position, we do not deem it necessary to pass upon the point because the total amount we have held appellee to be entitled would now be due under the provisions of Paragraph 12.

■ Appellants by their Point Six contend that "the trial court erred in rendering judgment for interest since the contract

does not provide for interest and interest is now allowable in an accounting proceeding between partners prior to the termination of a balance." In its judgment the trial court awarded Dr. Jones $6,694.16 interest from June 30, 1960, until the date of trial on the lump sum value of the cash benefits.

This proceeding is one in which there are mutual claims between the parties and there has been no delay in the accounting proceeding caused by misconduct on the part of appellants. If there has been any delay in accounting, it is caused by the demands of Dr. Jones. In his original petition on June 30, 1961, Dr. Jones in addition to other demands, sought $400,000.00 in damages from appellants to which the Court of Civil Appeals in Jones v. Chester, supra, found Dr. Jones was not entitled.

In Hairston v. Richie, 338 S.W.2d 263, no writ hist., the Fort Worth Court of Civil Appeals in finding that interest was not due in the partnership accounting held as follows:

"Another point is that it was error to render judgment for interest from October 31, 1956, the date the partnership was terminated, because there was neither pleading nor proof to sustain it. We think this point is well taken. Appellees prayed for judgment for debt and for their interest in the partnership properties, and for general relief. It has been held that where the date when money should have been paid is reasonably determined from the evidence, interest may be allowed from that date under a prayer for general relief. Trevathan v. G. M. Hall & Son, Tex.Civ.App., 209 S.W. 447. On the other hand, the general rule seems to be that no interest is allowed on partnership accounts prior to the time when an accounting is had and the balance is ascertained, unless an accounting has been delayed through misconduct or fraud. Corralitos Co. v. Mackay, 31 Tex.Civ.App., 316, 72 S.W. 624. * * *"

Also, in Jones v. Mitchell, 47 S.W.2d 371, (Tex.Civ.App.) writ ref., the Dallas Court of Civil Appeals held as follows in finding that the trial court did not err in refusing to allow interest:

"Appellee complains that this court, in response to a proper cross-assignment of error, should have allowed interest on the amount found in favor of appellee at the rate of 6 per cent. per annum from January 1, 1927 to the date of the judgment, and reform the judgment of lower court to this extent. We do not think the court erred in the refusal to allow such interest. This was a partnership in which each party claimed an indebtedness against the other party; we do not think there was a final accounting between them until the trial of the case. Appellee in his written argument states the rule that we think applies to this case under the facts above stated. This rule is, in the language of appellee, 'interest is not allowed on partnership accounts prior to the time an accounting is had, and the balance ascertained.' Prior to the trial, each party was contending the other owed him."

We might further point out that the contract itself does not provide for interest and there has not yet been a balance ascertained between Dr. Jones and appellants. This point is sustained.

Having determined that appellee was not entitled under the contract to the awards for vacation pay in the sum of $6,694.13 or interest in the sum of $6,994.16 and having further determined that the amount to which appellee was entitled for "accounts receivable" was $9,403.40 the judgment of the trial court is reformed so as to allow appellee to recover from the appellants, and each of them, the total sum of $18,064.-63, with interest from the date of the

judgment of this court until paid at the rate of six per cent per annum.

We have considered appellants' Points Three and Four and they are each over-ruled.

Judgment as reformed affirmed.